IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| Michael Paul Enmon | § | CASE NO. 18-60001 |
| | § | (Chapter 11) |
| | § | |
| DEBTOR | § | |

**DEBTOR'S AMENDED DISCLOSURE STATEMENT**

Michael Paul Enmon, the Debtor in this Bankruptcy Case, files this Amended Disclosure Statement pursuant to the provisions of 11 U.S.C. § 1125.

NEITHER THIS DISCLOSURE STATEMENT NOR THE CHAPTER 11 PLAN HAS BEEN APPROVED BY THE COURT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE.   ALL CREDITORS HAVE THE RIGHT TO OBJECT TO THIS DISCLOSURE STATEMENT AS NOT CONTAINING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125(b).

IN THE OPINION OF THE DEBTOR, THE TREATMENT OF CREDITORS AND THE INTEREST HOLDERS UNDER THE PLAN PROVIDES A GREATER CHANCE OF RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES REGARDING THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR.   ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN WOULD BE IN THE BEST INTERESTS OF CREDITORS, AND RECOMMENDS ACCEPTANCE OF THE PLAN.

1

I.        **I. INTRODUCTION**

    A.        **Introductory Facts**

        **1.**        Michael Enmon is the debtor in this Chapter 11 bankruptcy case.

        **2.**        On January 10, 2018, Michael Enmon ("Enmon" or "Debtor") filed this Chapter 11 case.

        **3.**        This document is the Disclosure Statement in Support of his Chapter 11 Plan, and it is provided to you to help you understand Enmon's Chapter 11 Plan.

        **4.**        Information contained in this Disclosure Statement summarizes the Plan and should not be solely relied upon for voting purposes.

        **5.**        Creditors and Interest Holders are urged to read the Plan carefully and are further urged to consult with their counsel in order to understand the Plan fully. The Plan is a legally binding document.

        **6.**        Under the Bankruptcy Code, a Debtor (and under some circumstances creditors too) may propose a Chapter 11 plan.   The plan may provide for a Debtor to reorganize his or her debts, to liquidate by selling assets of the estate, or a combination of both.

        **7.**        Michael Enmon is proposing a Plan to liquidate his assets, and provide the value generated to his creditors.

    B.        **Purpose of this Document**

        **1.**        This Disclosure Statement summarizes what is in the Chapter 11 Plan and provides information regarding the process the Bankruptcy Court follows to determine whether or not to approve the Plan.

---

READ THIS DISCLOSURE STATEMENT CAREFULLY TO LEARN
    a.   WHO CAN VOTE FOR OR AGAINST THE PLAN;
    b.   WHO CAN OBJECT TO THE PLAN;
    c.   THE PROPOSED TREATMENT OF YOUR CLAIM – THIS MEANS WHAT YOU WILL RECEIVE IF THE PLAIN IS CONFIRMED AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION;
    d.   THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;
    e.   WHAT THE BANKRUPTCY COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM A CHAPTER 11 PLAN;
    f.   FEASIBILITY OF THE CHAPTER 11 PLAN

---

2

**2.**      Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

**3.**      This Disclosure Statement cannot tell you everything about your rights in this case. You should consider consulting with a lawyer to obtain advice on how the Plan will affect you, and what is the best course of action for you.

**4.**      This Disclosure Statement is provided to each creditor whose claim has been scheduled by the Debtor, or who has filed a proof of claim against Debtor.

**5.**      Under the Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement.

**6.**      Bankruptcy Code § 1125 requires a Disclosure Statement to contain "adequate information" concerning the Debtor and the Plan. The term "adequate information" is defined as, "information of a kind, and in sufficient detail," about the debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the debtor to make an informed judgment about accepting or rejecting the Plan.

**7.**      The Bankruptcy Court has determined that the information contained in this Disclosure Statement is adequate, and it has approved this document in accordance with Bankruptcy Code § 1125(b).  The Bankruptcy Court's approval of this Disclosure Statement does not mean that the Bankruptcy Court has approved the Plan or determined that the Plan meets the requirements of the Bankruptcy Code.

**II.**    **CONFIRMATION PROCEDURES**

      **A.**    **Persons Potentially Eligible to Vote on the Plan**

3

**1.**     In determining acceptance of the Plan, votes will only be counted if submitted by a Creditor whose Claim is scheduled by the Debtor as undisputed, non-contingent, and unliquidated, or who, prior to the hearing on confirmation of the Plan, has filed with the Bankruptcy Court a proof of claim that has not been disallowed or suspended prior to computation of the votes on the Plan. <span style="color:red">To be eligible to vote, a Creditor's claim must be impaired.</span>

**2.**     The Ballot Form you received does not constitute a proof of claim. If you are uncertain if your Claim has been correctly scheduled, you should check the Debtor's Schedules which are on file with the Clerk of the Bankruptcy Court.

**3.**     THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. IF, HOWEVER, THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS IN THIS CASE.

**4.**     <u>Identity of Person to contact for More Information Regarding the Plan</u>

**a)**     Any interested party desiring further information about the Plan should contact Miriam Goott, counsel for the Debtor, via telephone at 713.956.5577, or via email at mgoottt@walkerandpatterson.com, or via regular mail at P.O. Box 613101, Houston, Texas 77208.

**III.     EXPLANATION OF CHAPTER 11**

**A.     <u>Chapter 11 of the Bankruptcy Code</u>**

**1.**     Upon filing of a Chapter 11 petition, Section 362 of the Bankruptcy Code provides for a temporary automatic stay of all attempts to collect claims that arose prior to the Filing Date, or otherwise to interfere with the Debtor's property or business, in order to permit the Debtor  to attempt to reorganize.

4

2.      Formulation of a Plan of Reorganization is the primary purpose of a Chapter 11 Reorganization Case.   A Plan of Reorganization sets forth the means for satisfying the holders of all claims against, and interests in, a debtor. Confirmation of a Chapter 11 Plan of Reorganization requires that either: (i) all classes of claims and interests entitled to vote accept the plan, or (ii) that the plan be accepted by the holders of at least one impaired class of claims not counting the votes of claims held by "insiders" as that term is defined by the Bankruptcy Code and, that the Plan be confirmed as to each objecting class pursuant to section 1129(b) of the Bankruptcy Code (the so called "cramdown" provisions).

3.      In addition to the acceptance requirements of at least one impaired class, Section 1129 of the Bankruptcy Code contains additional criteria that must be satisfied before a Bankruptcy Court may confirm a Plan of Reorganization.

4.      Confirmation of the Plan under Chapter 11 will relieve the Debtor of liability for any and all of the Debtor's pre-confirmation debts except as provided in the Plan, the Confirmation Order, or Section 1141(d) of the Bankruptcy Code.

5.      Confirmation makes the Plan binding upon the Debtor and all Creditors, whether or not they have accepted the Plan.

B.      **Disclaimers/Representations**

1.      The financial data relied upon in formulating the Plan is based on readily available documents such as the Debtor's books and records, appraisals, and evaluations.

2.      The financial information contained in this Disclosure Statement was compiled primarily from information provided by disclosures previously made by the Debtor. Accounting is on a cash basis. The Debtor has, and continues to maintain its books and records.   No representation can be made as to the accuracy of the Debtor's disclosures.

3.      This Disclosure Statement has been prepared solely for the benefit of creditors and interest holders of the Debtor.   No representations concerning the Plan are authorized other than those set forth in this Disclosure Statement.

**4.**     Any representation of inducement that is not contained herein should be reported to the attorneys for the Debtor, who will inform the court, and the court will take such action as it deems appropriate.

**5.**     The plan proponent does not warrant or represent that the information contained herein is correct, although great effort has been made to be accurate.

**6.**     This Disclosure Statement contains only a summary of the plan. The plan that accompanies this Disclosure Statement is in integral part of the Disclosure Statement, and each creditor and interest holder is urged to review the plan.

**7.**     The Debtor makes no representations with respect to the effects of taxation (state or federal) on the creditors with respect to the treatment of their claims under the plan, and no such representations are authorized.   Any tax information contained herein is made for information purposes only. Parties-in-interest are urged to seek the advice of their own professional advisors should they have any questions with respect to any taxation issues.

**8.**     The confirmation of the plan discharges the debtor from all dischargeable pre-confirmation debts pursuant to section 1141(d) of the Bankruptcy Code.

**9.**     In addition, other rights of creditors may be altered by the plan.

**10.**     Confirmation makes the plan binding upon all creditors and other parties-in-interest, regardless of whether or not they have accepted the plan.

**11.**     All initially capitalized words used in this Disclosure Statement have the same definitions set out in Article 1 of the Plan.

**C.**     **Procedure for Filing Proofs of Claim.**

**1.**     The Plan provides that Claims will be recognized only if evidenced by a timely filed proof of claim that is not disallowed by the Court, or if the Claim appears on the Debtor's schedules filed with the Court and is not designated as disputed, contingent or unliquidated.

6

**2.**       In addition, the Bankruptcy Code permits the Debtor to ask the Court to reject unexpired leases and executory contracts.

**3.**       The Plan provides that the party to any such lease or contract which is rejected must file a proof of claim for damages no later than thirty (30) days after the entry of the Order authorizing rejection of the lease or contract.

**4.**       Debtor's schedules may be reviewed in the Office of the Clerk of the Bankruptcy Court during regular business hours.

7

IV.    **BACKGROUND - THE CHAPTER 11 DEBTOR**

    A.    **The Debtor, Business Background and Events Leading to the Chapter 11 Filing**

        1.    **History between Michael Enmon and Prospect Capital**

          **a)**    In 2006, Michael Enmon ("Enmon" or "Debtor") was working in New Mexico as a commercial lending officer for Wells Fargo Bank.

          **b)**    During this time Enmon was the relationship manager for Caprock Pipe & Supply Co ("Caprock").   As a result of his successful relationship with Caprock, Enmon decided to quit working for Wells Fargo and purchase Caprock which was being sold for approximately $30,000,000.00.

          **c)**    In pursuit of financing, Enmon found CIT who agreed to be the senior secured lender by providing Enmon with a $22,000,000.00 loan for the purchase of Caprock.

          **d)**    Subsequently, Enmon found Prospect Capital ("Prospect") who agreed to loan Enmon an additional $12,000,000.00 of unsecured subordinated debt, plus 12% equity, to purchase Caprock.

          **e)**    After documents were prepared and sent to both lenders, the management of Prospect changed their minds and informed Enmon that Prospect would only fund the loan if Enmon decreased his ownership interest in Caprock from 70% to 7%.

        2.    **Enmon Sued Prospect**

          **a)**    The deal fell apart, and Enmon was no longer able to purchase Caprock.

          **b)**    Enmon hired a small law firm in Houston to sue Prospect in New York.   Prospect hired Skadden Arps.

          **c)**    The federal judge in New York ordered the parties to arbitrate.

8

**d)**      The arbitrator dismissed Enmon's claims and ordered Enmon to pay Prospect over $2,000,000.00 in attorney's fees that were incurred by Skadden Arps.

**3.     Enmon Transferred Mineral Interests to His Mother, Created a Trust and Bought Land**

**a)**      In 2007, Enmon deeded oil and gas minerals (which he previously inherited from his father) to his mother. The oil and gas minerals were valued at approximately $80,000.00.   By the end of 2008, two wells were drilled and Enmon's mother was able to sell the mineral interest for approximately $700,000.00.

**b)**      Enmon's mother used the proceeds from the sale of the mineral interest to pay creditors and created the Enmon Irrevocable Family Trust ("the Trust") with $400,000.00, making her son (the Debtor), and his wife, Kari Enmon the beneficiaries of the Trust.

**c)**      The Trust purchased 38.7 acres in Waller, Texas in December 5, 2008.

**4.     The Debtor Created Kickapoo Kennels, LLC**

**a)**      As avid dog lovers, Michael and his wife, Kari Enmon decided to create Kickapoo Kennels, LLC with the goal of creating a business that would allow them to spend their days caring for dogs and spending time with their own Labrador Retrievers.

**b)**      In December, 2009, the Trust and Kickapoo Kennels, LLC borrowed $1,980,500.00 from Mutual of Omaha to build Kickapoo Ranch Pet Resort ("Kickapoo").

**c)**      Kickapoo opened for business on February 1, 2011.

9

**d)**      Kickapoo is a distinctive resort hotel for pets, dedicated exclusively to the care of dogs and cats. They offer a variety of innovative services and amenities, including luxury guest accommodations, countless leisure activities, spa and grooming services, obedience training and day camp.

5.      **Prospect filed suit in the Southern District of Texas**

**a)**      Two weeks after Kickapoo opened for business, Prospect filed a lawsuit in the Southern District of Texas seeking a TRO against the Trust, Kickapoo, Enmon, Enmon's wife, and Enmon's mother.

**b)**      In 2012, Kickapoo filed a chapter 11 bankruptcy that was subsequently dismissed.

6.      **Federal District Judge Hoyt Voids the Transfer of all assets**

**a)**      In December, 2012, Judge Hoyt entered a final judgment that found the original transfer of the mineral interest from Enmon to his mother was a fraudulent transfer, that all transfers to Kickapoo Kennels, LLC were void, and that all transfers to the Enmon Irrevocable Family Trust were also void.

7.      **Prospect Sues the Bank**

**a)**      In 2012, while Enmon was successfully operating Kickapoo, Prospect changed gears and sued Mutual of Omaha, the bank who previously loaned Kickapoo the funds to build the business.

**b)**      Prospect spent years litigating against Mutual of Omaha, claiming that Mutual of Omaha's lien was inferior to Prospect's judgment.

**c)**      Prospect lost.   Prospect appealed and lost the appeal.

8.      **Prospect Seeks the Appointment of a Receiver**

**a)**      After Prospect was unsuccessful in suing Mutual of Omaha, they returned to Judge Hoyt and asked for a receiver be appointed over Enmon and Kickapoo.

**b)**     Enmon met with new bankruptcy counsel and determined that the best way to address and finally deal with the Prospect judgment was to monetize the value of all of his assets and pay the value of his assets to his creditors.

**c)**     On January 10, 2018, Enmon filed his Chapter 11 bankruptcy.

8.   **Prospect Responses** Regarding Certain Matters Set Forth Above:

   a.   It is Prospect Capital Corporation's ("Prospect") position that Creditors in Classes 1, 2, 3, 4, 5 and 6 are not impaired under the Debtor's proposed Plan and, therefore, would not be entitled to vote.

   b.   Prospect contests the Debtor's allegation that Allegiance Bank's liens in the Debtor's real property are superior to Prospect's judgment lien. If properly classified, Allegiance Bank's claim should be impaired under the Plan.

   c.   Prospect (and other parties) retain their rights under the Bankruptcy Code and Rules to seek a determination as to the dischargeability of their claims pursuant to Section 523, and a determination that the Debtor is not entitled to a discharge pursuant to Section 1141(d)(3).

   d.   Prospect believes that all or a portion of its claim will be excepted from discharge under Section 523 and/or the Debtor may be denied a discharge pursuant to Section 1141(d)(3).

   e.   Prospect believes that the following more accurately reflects the history between Michael Enmon and Prospect Capital:

      i.   In 2006, Michael Enmon ("Enmon" or "Debtor") was working in New Mexico as a commercial lending officer for Wells Fargo Bank.

      ii.   During this time Enmon was the relationship manager for Caprock Pipe & Supply Co ("Caprock"). As a result of his successful relationship with Caprock, Enmon decided to quit working for Wells Fargo and purchase Caprock which was being sold for approximately $30,000,000.00.

      iii.   In pursuit of financing, Enmon found CIT who tentatively agreed to be the senior secured lender by providing Enmon with a $17,800,000.00 loan for the purchase of Caprock.

      iv.   Subsequently, Enmon and Prospect Capital ("Prospect") discussed proposed terms for a loan to Enmon of an additional   $10,000,000.00 of subordinated debt to finance Enmon's purchase of Caprock. On April 11, 2006, Prospect and the Debtor entered into a letter agreement (the "Letter Agreement") providing *inter alia* that Prospect could, in its "sole discretion," "decline to participate in the proposed financing without incurring any liability."

      v.   Prospect ultimately declined to provide financing to the Debtor's company, which it was entitled to do under the Letter Agreement.

      vi.   The deal fell apart, and Enmon was no longer able to purchase Caprock.

      vii.   Enmon hired a law firm in Houston to sue Prospect in Texas, and filed a complaint asserting claims for fraud against Prospect and seeking more than $50 million in alleged damages.   Prospect hired Skadden Arps and sought to compel arbitration in New York.

11

    viii.  The federal judge in New York ordered the parties to arbitrate.

    ix.  On April 14, 2008, the arbitrator dismissed the Debtors' claims in their entirety, finding there was "no credible evidence" supporting them, awarded the Debtor nothing and found that Prospect should be awarded its attorneys' fees in defending against the Debtor's baseless claims. On October 15, 2008, the United States District Court for the Southern District of New York confirmed the Attorneys' Fee Award and issued a final judgment in favor of Prospect against the Debtor for the full amount of Prospect's attorneys' fees, $2,287,687.32, plus 9% interest. The District Court later granted Prospect's post-judgment motion for sanctions against the Debtor's law firm, Arnold & Itkin, LLP, based on the "persistent, frivolous litigation" it pursued on the Debtor's behalf. The United States Court of Appeals for the Second Circuit later affirmed this sanctions award.

    x.  One month after the Attorneys' Fee Award, on September 24, 2008, the Debtor directed his lawyer to form the Enmon Irrevocable Family Trust (the "Enmon Trust"). The Debtor then transferred his most valuable asset at the time—mineral rights—to his mother, who then sold part of those mineral rights for approximately $700,000 and transferred the proceeds to the Enmon Trust.

    xi.  The Debtor and his wife, Kari Enmon, are the beneficiaries of the Enmon Trust.

    xii.  The Trust purchased 38.7 acres in Waller, Texas (the "Waller Texas Property") in December 5, 2008 with funds received from the sale of the aforementioned mineral interests.

    xiii.  After the entry of the Arbitration Judgment in favor of Prospect, the Debtor and his wife, Kari Enmon formed Kickapoo Kennels, LLC ("Kickapoo"). Kickapoo operates on the Waller Texas Property.

    xiv.  In December, 2009, the Trust and Kickapoo Kennels, LLC borrowed $1,980,500.00 from Mutual of Omaha to build Kickapoo Ranch Pet Resort.

    xv.  Kickapoo began operating on February 1, 2011.

      ~~Kickapoo is a distinctive resort hotel for pets, dedicated exclusively to the care of dogs and cats. They offer a variety of innovative services and amenities, including luxury guest accommodations, countless leisure activities, spa and grooming services, obedience training and day camp.~~

    xvi.  Two weeks after Kickapoo opened for business, Prospect filed a fraudulent transfer lawsuit in the Southern District of Texas (the "Fraudulent Conveyance Action") seeking a TRO against the Trust, Kickapoo, Enmon, Enmon's wife, and Enmon's mother. After entry of the TRO, on April 11, 2012, Judge Hoyt found the Debtor, Kari Enmon and Kickapoo in contempt of court, and directed them to deposit $79,645.89 into the registry of the court.

    xvii.  On April 25, 2012 — two weeks before trial in the Fraudulent Conveyance Action was scheduled to begin — the Debtor's mother Grace Enmon filed for bankruptcy in the Eastern District of Texas (the "Grace Enmon Bankruptcy"), which resulted in a stay of the fraudulent transfer action.

    xviii.  On June 27, 2012, the United States Trustee for the Grace Enmon Bankruptcy filed a Motion to Dismiss the bankruptcy case, stating: "The

**Formatted:** List Paragraph, Line spacing: single, Numbered + Level: 3 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Right + Aligned at:  1.38" + Indent at:  1.5"

**Formatted:** List Paragraph, Line spacing: single, Numbered + Level: 3 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Right + Aligned at:  1.38" + Indent at:  1.5"

present case was filed as a litigation tactic to forestall the Prospect lawsuit. This is not a good faith use of the bankruptcy process." The bankruptcy court subsequently dismissed the Grace Enmon Bankruptcy as a bad faith filing and sanctioned Ms. Enmon's bankruptcy attorney.

xix. Two weeks after Kickapoo opened for business, Prospect filed a fraudulent transfer lawsuit in the Southern District of Texas (the "Fraudulent Conveyance Action") seeking a TRO against the Trust, Kickapoo, Enmon, Enmon's wife, and Enmon's mother. After entry of the TRO, on April 11, 2012, Judge Hoyt found the Debtor, Kari Enmon and Kickapoo in contempt of court, and directed them to deposit $79,645.89 into the registry of the court.

xx. On April 25, 2012 — two weeks before trial in the Fraudulent Conveyance Action was scheduled to begin — the Debtor's mother Grace Enmon filed for bankruptcy in the Eastern District of Texas (the "Grace Enmon Bankruptcy"), which resulted in a stay of the fraudulent transfer action.

xxi. On June 27, 2012, the United States Trustee for the Grace Enmon Bankruptcy filed a Motion to Dismiss the bankruptcy case, stating: "The present case was filed as a litigation tactic to forestall the Prospect lawsuit. This is not a good faith use of the bankruptcy process." The bankruptcy court subsequently dismissed the Grace Enmon Bankruptcy as a bad faith filing and sanctioned Ms. Enmon's bankruptcy attorney.

xxii. On November 27, 2012, after trial in the Fraudulent Conveyance Action, Judge Hoyt entered a Memorandum Opinion and Order (amended to correct a technical error on February 5, 2013), finding that the Debtor participated in a fraudulent scheme to hide the Debtor's assets from Prospect.

xxiii. On December, 17, 2012, Judge Hoyt entered a final judgment that found the original transfer of the mineral interest from Enmon to his mother was a fraudulent transfer, that all transfers to Kickapoo Kennels, LLC were void, and that all transfers to the Enmon Irrevocable Family Trust were also void. A copy of the Fraudulent Conveyance Judgment and Opinion are attached hereto as Exhibits ___ . The Debtor appealed the Fraudulent Conveyance Judgment to the Fifth Circuit and it was affirmed.

xxiv. On December 20, 2012, three days after entry of the Fraudulent Conveyance Judgment, Kickapoo filed for bankruptcy in the United States Bankruptcy Court for the Southern District of Texas (the "Kickapoo Bankruptcy").

xxv. On June 19, 2013, the bankruptcy court held that "this case appears to have been filed in order to gain an unfair advantage in a two-party dispute" and dismissed the Kickapoo Bankruptcy as a bad faith filing. In 2012, while Enmon was operating Kickapoo, Prospect sued Mutual of Omaha, the bank who previously loaned Kickapoo the funds to build the business. Prospect spent years litigating against Mutual of Omaha, claiming that Mutual of Omaha's lien was inferior to Prospect's judgment. Prospect lost. Prospect appealed and lost the appeal.

xxvi. After conducting post-judgment discovery, Prospect returned to Judge Hoyt and asked for a receiver be appointed over Enmon and Kickapoo. Prospect

**Formatted:** List Paragraph, Line spacing: single, Numbered + Level: 3 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Right + Aligned at:  1.38" + Indent at:  1.5"

**Formatted:** List Paragraph, Line spacing: single, Numbered + Level: 3 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Right + Aligned at:  1.38" + Indent at:  1.5"

and the Debtor initially agreed to the appointment of a receiver. Enmon subsequently met with new bankruptcy counsel and determined that the best way to address and finally deal with the Prospect judgment was to monetize the value of all of his assets and pay the value of his assets to his creditors. Prospect disagrees that this is the best way to address Prospect's judgments against the Debtor.

xxvii. On January 10, 2018, immediately prior to the hearing on Prospect's receivership motion, Enmon filed his Chapter 11 bankruptcy.

xxviii. Based on Judge Hoyt's judgment declaring that all assets transferred to the Trust or to the company are void, the Debtor listed all trust assets and Kickapoo assets as assets of the estate in his bankruptcy schedules. For the reasons set forth in its Motion to Dismiss [Docket No. 45], Prospect does not agree with the Debtor's interpretation of the Fraudulent Conveyance Judgment.

c)xxix. The operation of Kickapoo Ranch Pet Resorts ("KRPR") (the d/b/a formerly utilized by Kickapoo Kennels, LLC) is the Debtor's greatest asset. The Debtor hired John Baumgartner, the Managing Director of Stout Advisory to appraise the business. Baumgartner valued KRPR at $1,500,000.00, which includes the value of the real property as part of the ongoing operations of the business. Prospect disputes that Kickapoo and Enmon Trust assets are property of the estate. Prospect further disputes the valuations provided by Mr. Baumgartner as to the Kickapoo and Enmon Trust assets.

**Formatted:** List Paragraph, Line spacing: single, Numbered + Level: 3 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Right + Aligned at:  1.38" + Indent at:  1.5"

**Formatted:** List Paragraph, Line spacing: single, Numbered + Level: 3 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Right + Aligned at:  1.38" + Indent at:  1.5"

14

V.      **SIGNIFICANT EVENTS DURING THE BANKRUPTCY**

     A.     <u>**Bankruptcy Proceedings**</u>

         1.     The following is a chronological list of significant events which have occurred during this case.

             **a)**     The Debtor filed his Schedules and Statement of Financial Affairs;

             **b)**     Cash Collateral was approved, providing limited and restricted use of the cash collateral of Mutual of Omaha;

             **c)**     Applications to Employ Professionals filed.

VI.     **ENMON'S ASSETS, DEBTS, AND INCOME**

     A.     <u>**The Debtor's Assets**</u>

         1.     The Debtor's bankruptcy schedules include a list of all his assets.

         2.     Based on Judge Hoyt's judgment declaring that all assets transferred to the Trust or to the company are void, the Debtor listed all trust assets and Kickapoo assets as assets of the estate in his bankruptcy schedules.

         3.     The operation of Kickapoo Ranch Pet Resorts ("KRPR") (the d/b/a formerly utilized by Kickapoo Kennels, LLC) is the Debtor's greatest asset.  The Debtor hired John Baumgartner, the Managing Director of Stout Advisory to appraise the business.  Baumgartner valued KRPR at $1,500,000.00, which includes the value of the real property as part of the ongoing operations of the business.

         4.     A summary of how Baumgartner arrived at the $1,500,000.00 appraisal is attached to the Disclosure Statement as "Exhibit A".

         5.     <u>**Remaining Business Assets and Personal Property**</u>

             **a)**     In total, all of the Debtor's business and personal assets (excluding KRPR as a business and the real property that Kickapoo is located on), are valued at $404,446.34 <span style="color:red">(Prospect disputes this valuation)</span>.

      b)      Below is a summary of all of the Debtor's remaining personal and business assets:

| Asset | Value |
|---|---|
| 2015 Ram Pickup Truck * | $26,000.00 |
| 2015 John Deere Tractor * | $13,000.00 |
| 2015 Ram Pro Master * | $17,000.00 |
| 2017 Porsche Cayenne * | $62,000.00 |
| 2014 Boat (Pro Drive) | $12,000.00 |
| Mineral Interest | Approx. $40,000.00 |
| Personal and household items (including dogs) | $37,422.75 |
| Business equipment, supplies, machinery, equipment, fixtures, inventory, etc. | $160,093.25 |
| Financial Assets (including checking account balance) | $36,930.34 |
| Misc. | |
| **TOTAL** | **$404,446.34** |

\* Mutual of Omaha has a lien on all KRPR assets, cash, equipment, *etc.*

**B.**    **Creditors**

    **1.**    **Secured Creditors** – Below is a breakdown of the secured creditors in this case.

| CREDITOR | COLLATERAL | BALANCE OWED |
|---|---|---|
| Mutual of Omaha | Mineral Rights, Improved Real Property, KPR Personal Property | $1,584.174.36 |
| Allegiance Bank | second (2nd) lien on all real property, inventory, chattel paper, accounts, equipment and general intangibles | $334,883.00 |
| Ally Financial | 2015 Ram Pro Master 3500 | $9,577.00 |
| Chase Auto Finance | Porsche | $62,010.00 |
| John Deere Financial | Lawnmower | $12,932.00 |
| Wauson Probus | Trust | $98,963.22 |
| **TOTAL DEBT** | | **$2,102,539.58[1]** |

Formatted: Line spacing: single

Formatted: Font: Times New Roman Bold, Superscript

Formatted: Font: 8 pt

Formatted: Font: 8 pt

Formatted: Font: 8 pt

---

[1] Prospect disputes the characterization of Wauson Probus as secured. Based on the Debtor's theory of this case, Kickapoo's equity has no value and it is the only form of security supporting Wauson Probus' claim. Additionally, Prospect filed an abstract of judgment entitling it to a lien on any real property owned by the Debtor.

2.    **Unsecured Creditors** – Below is a breakdown of the unsecured creditors in this case.

| NAME OF CREDITOR | BALANCE OWED |
|---|---|
| Bart De Bie | Prospect Judgment (Joint and Several liability of approx. $4,000,000.00 with 5 other parties listed below) |
| Brad Mitchell | $33,541.53 – business related debt |
| Chad Dufrene | $47,375.40 – business related debt |
| David Bello | $295,166.46 – business related debt |
| EdFinancial Services | $18,058.00 – student loan |
| John F. Barry | Prospect Judgment (Joint and Several liability of approx. $4,000,000.00 with 5 other parties listed below) |
| M. Grier Eliasek | Prospect Judgment (Joint and Several liability of approx. $4,000,000.00 with 5 other parties listed below) |
| Prospect Capital Corp. | Prospect Judgment (Joint and Several liability of approx. $4,000,000.00 with 5 other parties listed below) |
| Prospect Capital Corp. | $120,354.11 – Per Judge Hoyt Order |
| Prospect Capital Mmgt | Prospect Judgment (Joint and Several liability of approx. $4,000,000.00 with 5 other parties listed below) |
| Walter Parker | Prospect Judgment (Joint and Several liability of approx. $4,000,000.00 with 5 other parties listed below) |
|  | **TOTAL**: $4,514,495.50. |

C.    **Debtor's Monthly Income**

1.    The Debtor's only source of income comes from KRPR.

2.    The Debtor's approximate average monthly income is $125,000.00

D.    **Debtor's Monthly Expenses**

1.    The Debtor's monthly expenses can be broken down into two main categories: business expenses for KRPR and personal expenses for the debtor, his wife and his elderly mother.

2.    Some of the Debtor's personal and business expenses merge as the debtor

17

lives and works on the same property.

3.        Average monthly **PERSONAL** expenses

| EXPENSE | AMOUNT |
|---|---|
| Mortgage on Real Property | $22,350.97 |
| Real estate taxes | $2,620.00 |
| Food, housekeeping, supplies | $1,800.00 |
| Clothing/Laundry/Dry Cleaning | $500.00 |
| Personal care/Services | $1,500.00 |
| Medical/Dental | $500.00 |
| Transportation | $2,000.00 |
| Entertainment | $1,000.00 |
| Charitable contributions | $1,500.00 |
| Health Insurance | $2,150.00 |
| Estimated taxes | $7,000.00 |
| SUV Payment | $1,401.00 |
|  |  |
| **TOTAL PERSONAL EXPENSES** | **$44,321.97** |

E.        **Average Monthly <u>BUSINESS</u> Expenses:**

| Expense | Amount |
|---|---|
| Van Payment | $1,223.00 |
| Tractor Payment | $385.88 |
| (Sales, General and Admin. Expenses) | $35,000.00 |
| Labor Expenses | $27,030.00 |
| Franchise Taxes | $266.00 |
| Capital Improvements | $13,500.00 |
| **TOTAL BUSINESS EXPENSES** | **$77,404.88** |

VII.     <u>**SUMMARY OF THE PLAN**</u> - The Plan classifies Claims in various Classes.   The plan

states whether each Class of Claims is impaired or unimpaired.   Prospect generally disputes both the Debtor's classification of claims and his statements regarding whether each Class of Claims is impaired or unimpaired.   The Plan provides the treatment each Class will receive as follows:

**A.**   **Non-Voting Classes**

**1.**   Certain types of Claims are not placed into voting Classes; instead they are unclassified.   They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them under the Bankruptcy Code.

**2.**   As such, the Debtor has not placed the following Claims in a Class.   The treatment of these Claims is provide below.

**B.**   **Administrative Expenses and Priority Tax Claims**

**1.**   Administrative Expenses are Claims for costs or expenses administering the Debtor's Chapter 11 case, which are allowed under Bankruptcy Code § 503(b). Fees payable to the Clerk of the Bankruptcy Court and the Office of the United States Trustee were also incurred during the Chapter 11 Case.

**2.**   The Bankruptcy Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to different treatment.   The Bankruptcy Court must approve all professional compensation and expenses.   Each Professional Person requesting compensation in the case pursuant to Bankruptcy Code §§ 327, 328, 330, 331, 503(b) and/or 1103 shall file an application for allowance of final compensation and reimbursement of expenses not later than ninety (90) days after the Confirmation Date.

**3.**   Nothing in the Plan prohibits a Professional Person from requesting interim compensation during the course of this case pending Confirmation of this Plan. No motion or application is required to fix fees payable to the Clerk's office of the United States Trustee, as those fees are determined by statute.

**4.**   Allowed Administrative Claims arising under 11 U.S.C. § 503(b) will be paid in Cash and in full by the Reorganized Debtor on the later of (a) the Effective Date, (b) the date on which such Administrative Claim becomes an Allowed Claim; or (c) such other date as the Reorganized Debtor and the holder of the Allowed Administrative Claim shall agree.

**5.**   Allowed Priority Tax Claims against the Debtor will be paid in Cash by the

19

Reorganized Debtor within 5 years of the entry of the Order for Relief in this case or such other date as the Reorganized Debtor and the holder of the Allowed Priority Tax Claim shall agree.

**6.**     It is anticipated that administrative expenses will approximate $150,000.00.

## VIII.  CLASSIFIED CLAIMS AND INTEREST

The right to dispute or object to any/all of the claims listed in this Disclosure Statement is not waived by the listing, description, identification or other references. Debtor's listing of claim amounts is for informational purposes only and is not binding in future claim objection proceedings. The listed claim amounts are either from filed proofs of claim or the Debtor's estimate of the claims as reflected in the Debtor's Schedules.

**A.**     **Classes of Secured Claims**

**1.**     Secured Claims are Claims secured by liens on property of the estate.

**2.**     The following represents all Classes containing pre-petition Secured Claims and their treatment under this Plan.

**B.**     **Class 1 - Secured Property Tax Claims.**

**1.**     Class 1 is impaired and is entitled to vote.

**2.**     All Secured Property Tax Claims will be paid in full, with statutory interest, on or before July 1, 2018.

**3.**     All Class 1 Claims will retain their statutory lien.

**4.**     Debtor will reserve the right to prepay any Class 1 Claim without penalty.

**5.**     The tax obligations included in Class 1 are:

| Taxing Jurisdiction | Time Period | Estimated Amount |
|---|---|---|
| Waller ISD | 2017 | $20,854.00 |
| Harris County | 2017 | $10,628.00 |
| Texas Comptroller – Sales Tax | 2017 | $14,131.00 |
| Texas Comptroller – Franchise Tax | 2017 | $3,200.00 |
| | | **TOTAL $48,813.00** |

**C.**     **Class 2 – Mutual of Omaha**

**1.**     Class 2 is impaired and is entitled to vote.

**2.**     The debt is secured by the following collateral:

**a)**     Real Property, together with all buildings, structures, and other

improvements located thereon and rents and revenues from the property described as 23230 Kickapoo Road, Waller, TX 77484, and more specifically described as 38.791 acre tract located in the Jesse Denson Survey, Abstract 14, Harris County, Texas and being a part of a called 122.422 acre tract (Volume 482, Page 144, Harris County Deed Records) located in the Jesse Denson Survey, Abstract 14, Harris County, and Jesse Denson Survey, Abstract 23, Waller County, Texas;

**b)**     Mineral Interests in Shelby County, TX;

**c)**     Accounts;

**d)**     Chattel Paper including tangible chattel paper and electronic chattel paper;

**e)**     Deposit Accounts;

**f)**     Documents;

**g)**     General Intangibles, including payment intangibles;

**h)**     Goods, including equipment, fixtures, inventory and accessions;

**i)**     Instruments, including Promissory Notes;

**j)**     Records;

**k)**     Software;

**l)**     Life Insurance policy issued on the life of Michael Enmon in the amount of $500,000.00;

**m)**     Life Insurance policy issued on the life of Kari Enmon;

**n)**     The Class 2 Secured Debt will be deemed cured of all financial and non-financial defaults as of the Confirmation Date and the instruments evidencing the Secured Debt will be modified, including the deletion of prepayment penalties and reporting obligations other than as provided in the Plan.

**o)**     Class 2 shall retain their security interest upon confirmation.

**p)**     Mutual of Omaha will be paid monthly amortized amounts as reflected in the original loan documents (as may have been amended or modified) in effect as of the Petition Date.   The assets securing the claim of Mutual of Omaha will be sold pursuant to section 363(f) of the Bankruptcy Code, with security interests attaching to the proceeds of the sale of the

21

collateral in the same manner and priority as existed on the Petition Date. Mutual of Omaha shall be paid in full, with contractual interest, on or before the 180th day following the Effective Date, or on such other terms as Mutual of Omaha may agree.

**D.**    **Class 3 – Allegiance Bank**

**1.**    Class 3 is impaired and is entitled to vote.

**2.**    The debt is secured by a second (2nd) lien on all real property, inventory, chattel paper, accounts, equipment and general intangibles.

**3.**    The Class 3 Secured Debt will be deemed cured of all financial and non-financial defaults as of the Confirmation Date and the instruments evidencing the Secured Debt will be modified, including the deletion of prepayment penalties and reporting obligations other than as provided in the Plan.

**4.**    Class 3 shall retain their security interest upon confirmation.

**5.**    Allegiance Bank will be paid monthly amortized amounts as reflected in the original loan documents (as may have been amended or modified) in effect as of the Petition Date.   The assets securing the claim of Allegiance Bank will be sold pursuant to section 363(f) of the Bankruptcy Code, with security interests attaching to the proceeds of the sale of the collateral in the same manner and priority as existed on the Petition Date.

**6.**    Allegiance Bank shall be paid in full, with contractual interest, on or before the 180th day following the Effective Date, or on such other terms as Allegiance Bank may agree.

**E.**    **Class 4 – Ally Financial**

**1.**    Class 4 is impaired and is entitled to vote.

**2.**    This debt is secured by the following collateral:

**a)**    2015 Ram Pro Master 3500 (approx. 56,000 miles).

**3.**    The Class 4 Secured Debt will be deemed cured of all financial and non-financial defaults as of the Confirmation Date and the instruments evidencing the Secured Debt will be modified, including the deletion of prepayment penalties and reporting obligations other than as provided in the Plan.

**4.**    Class 4 shall retain their security interest upon confirmation.

**5.**    The asset securing the claim of Ally Financial will be sold pursuant to

22

section 363(f) of the Bankruptcy Code, with security interests attaching to the proceeds of the sale of the collateral in the same manner and priority as existed on the Petition Date.   Ally Financial shall be paid in full, with contractual interest, on or before the 180th day following the Effective Date, or on such other terms as Ally Financial may agree.

**F.     Class 5 – Chase Auto Finance**

**1.**     Class 5 is impaired and is entitled to vote.

**2.**     This debt is secured by the following collateral:

**a)**     2017 Porsche Cayenne (approx. 13,000 miles).

**3.**     The Class 5 Secured Debt will be deemed cured of all financial and non-financial defaults as of the Confirmation Date and the instruments evidencing the Secured Debt will be modified, including the deletion of prepayment penalties and reporting obligations other than as provided in the Plan.

**4.**     Class 5 shall retain their security interest upon confirmation.

**5.**     The asset securing the claim of Chase Auto Finance will be sold pursuant to section 363(f) of the Bankruptcy Code, with security interests attaching to the proceeds of the sale of the collateral in the same manner and priority as existed on the Petition Date.  Chase Auto Finance shall be paid in full, with contractual interest, on or before the 180th day following the Effective Date, or on such other terms as Chase Auto Finance may agree.

**G.     Class 6 – John Deere Financial**

**1.**     Class 6 is impaired and is entitled to vote.

**2.**     This debt is secured by the following collateral:

**a)**     2015 John Deere 3039 Compact Utility Tractor

**3.**     The Class 6 Secured Debt will be deemed cured of all financial and non-financial defaults as of the Confirmation Date and the instruments evidencing the Secured Debt will be modified, including the deletion of prepayment penalties and reporting obligations other than as provided in the Plan.

**4.**     Class 6 shall retain their security interest upon confirmation.

**5.**     The asset securing the claim of John Deere Financial will be sold pursuant to section 363(f) of the Bankruptcy Code, with security interests attaching to the proceeds of the sale of the collateral in the same manner and priority as existed on

the Petition Date.  John Deere Financial shall be paid in full, with contractual interest, on or before the 180th day following the Effective Date, or on such other terms as John Deere Financial may agree.

**H.**     **Class 7 – Wauson Probus**

**1.**     Class 7 is impaired and is entitled to vote.

**2.**     This debt is secured by the following collateral:

    **a)**     The Debtor's interest in Kickapoo Kennels, LLC.

**3.**     The Class 7 Secured Debt will be deemed cured of all financial and non-financial defaults as of the Confirmation Date and the instruments evidencing the Secured Debt will be modified, including the deletion of prepayment penalties and reporting obligations other than as provided in the Plan.

**4.**     Class 7 shall retain their security interest upon confirmation.

**5.**     The asset securing the claim of Wauson Probus will be sold pursuant to section 363(f) of the Bankruptcy Code, with security interests attaching to the proceeds of the sale of the collateral in the same manner and priority as existed on the Petition Date.  Wauson Probus be paid in full on or before the 180th day following the Effective Date, or on such other terms as Wauson Probus may agree.

**5.6.**   Prospect believes that based upon statements made in this Disclosure Statement, Wauson Probus' claim is secured by property (stock in Kickapoo) that has no value.  As such, Prospect disputes this claimbeing classified as anything other than a general unsecured claim.

**I.**     **Class 8 – Prospect Judgment Creditors**

**1.**     Class 8 is impaired and is entitled to vote.

**2.**     Class 8 is an unsecured creditor with a debt that stems from an arbitration award. The Prospect Judgment Creditors have filed abstracts of judgment, however their judgment remains unsecured due to prior and superior liens on the real property of the Debtor.

**3.**     Class 8 will share in excess proceeds from the sale of the estate's assets, pro-rata with Class 9.

**4.**     Prospect believes it has a secured claim against any real property owned by the Debtor. To the extent Prospect's claim is undersecured, it should have a deficiency claim in the general unsecured claims class.

3.5.    Prospect does not believe its deficiency claim should be separately classified from the general unsecured claims class.

**J.**   **Class 9 – General Unsecured Creditors**

**1.**    Class 9 is impaired and is entitled to vote.

**2.**    The claims in this class consist of non-insider creditors asserting unsecured claims against the Debtor.

**3.**    Class 9 will share in excess proceeds from the sale of the estate's assets, pro-rata with Class 8.

**4.**    Class 9 claims are estimated to be:

| | |
|---|---|
| Brad Mitchell | $33,541.53 |
| Chad Dufrene | $47,375.40 |
| David Bello | $295,166.46 |
| Ed Financial Services | $18,058.00 |
| **TOTAL** | **$394,141.39** |

**K.**   **Class 10 – Interests of the Debtor**

**1.**    Class 10 is impaired and is entitled to vote.

**2.**    Class 10 consists of the interests of the Debtor in the assets of the estate.

**3.**    Class 10 retains no interest in any asset of the estate.

**Formatted:** Underline

3.4.    Prospect reserves the right to assert that the Debtor is retaining an interest in property under the Plan.

**L.**   **Cramdown and Absolute Priority Rule**

**1.**    If a Class of Creditors does not accept the Plan, the Debtor will seek to obtain Confirmation through the cramdown provisions of Bankruptcy Code § 1129(b).

**2.**    This means that the Plan must be fair and equitable to the Class that does not accept the Plan.

**3.**    The test for whether the Plan is fair and equitable is found under Bankruptcy Code § 1129(b).

**4.**    The balance of this section only applies if a Class of Unsecured Claims does

25

not accept the Plan.

**5.**     If a Class of Unsecured Claims has not voted to accept the Plan, the Absolute Priority Rule provides that Debtor may not retain a prepetition interest in property unless all creditors are paid in full.

**6.**     The absolute priority rule is not implicated under the Debtor's proposed plan because he will not retain an interest in any property.   Prospect disputes this allegation.

**M.**    **Acceptance or Rejection of Plan**

**1.**     Each Impaired Class of Creditors with Claims against the Debtor's estate shall be entitled to vote separately to accept or reject the Plan.

**2.**     A Class of Creditors shall have accepted the Plan if the Plan is accepted by at least two-thirds in the aggregate dollar amount and more than one-half in number of holders of the Allowed Claims of such Class that have accepted or rejected the Plan.

**3.**     In the event that any Impaired Class of Creditors or Interest holders shall fail to accept the Plan in accordance with Bankruptcy Code § 1129(a), the Proponent reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code § 1129(b).

**IX.**    **MEANS OF EFFECTUATING A PLAN**

**A.**    **Funding for the Plan**

**1.**     The Debtor proposes to sell the assets of the estate.   The Debtor currently has an offer to purchase the assets for approximately $2.25 million.

**2.**     At confirmation, property of the estate shall not revest in the Debtor, but shall remain in the estate and be sold pursuant to section 363(f) of the Bankruptcy Code.   The current proposed purchaser is an entity to be created that will be owned 100% by Kari Enmon, wife of the Debtor.   Ms. Enmon has arranged for financing that will fund the purchase.

**3.**     The Debtor will consider any and all offers to purchase the assets for more than $2.35 million prior to confirmation.

**4.**     The Debtor's Plan provides that all assets shall be transferred free and clear of any and all claims.

26

**5.**      Proceeds of the sale shall be delivered to a third-party Disbursement Agent – Eva Engelhart. Ms. Engelhart's firm, Ross Banks, represents Allegiance Bank, a secured creditor under the Plan. The Disbursement Agent shall be solely responsible for reviewing, objecting to, and paying claims asserted against the estate.

~~5.~~6.      Prospect contends that the proposed transaction is nothing more than a refinance of existing secured debt and does not provide any new value to unsecured creditors.

## X.    FEASIBILITY

### A.    Feasibility of this Plan

**1.**      A requirement for Confirmation is that the Plan must be feasible, which means that Plan Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

**2.**      The Debtor contends that this plan is feasible as there will be enough cash from the sale of all property to fund the Debtor's chapter 11 plan.

## XI.    LIQUIDATION ANALYSIS

### A.    Best Interest of Creditors Test

**1.**      A requirement for confirmation is the "Best Interest of Creditors Test," which requires the Proponent to provide a liquidation analysis.

**2.**      Under this test, if a claimant is in an Impaired Class and that claimant does not vote to accept the Plan, then that claimant must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

**3.**      In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured Creditors are paid first from the sales proceeds of properties on which the Secured Creditor has a lien. Administrative claims are paid next. Then Unsecured Creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured Creditors with the same priority share in proportion to the amount of their Allowed Claims.

**4.**    The Debtor's proposed plan provides for the liquidation of his assets without the overhead and administrative expense of a chapter 7 proceeding.   The Debtor's proposed plan provides each creditor more than it would receive in a chapter 7.

4.**5.**    Prospect contests the allegations in this section.

**B.**    **Disbursing Agent**

**1.**    Eva Engelhart shall act as the Disbursing Agent for the purpose of reviewing and objecting to claims, and for making all distributions provided for under the Plan.

**2.**    Eva Engelhart is currently a Chapter 7 Trustee in Houston, Texas, and has been chosen as a Disbursing Agent as she is bonded and has experience in distributing funds, reviewing claims, and objecting to claims when necessary.

**3.**    Eva Engelhart shall receive the standard chapter 7 Trustee compensation for distribution services rendered and expenses incurred pursuant to the Plan.

**C.**    **Business Broker**

**1.**    The Debtor intends on hiring Ron Latta with RL Financial Advisory Services, LLC to market and sell the business in order to determine if there are any other potential buyers, other than Ms. Enmon's entity.

**2.**    Neither the Debtor nor Debtor's attorney have any connection to Mr. Latta.

**XII.**    **TREATMENT OF MISCELLANEOUS ITEMS**

**A.**    **Executory Contracts**

**1.**    All Executory Contracts disclosed by the Debtor in his Schedule G filed with the Court are assumed.

**2.**    All other contracts, to the extent they existed on the petition date are rejected.

**B.**    **Retention of Jurisdiction**

**1.**    Notwithstanding confirmation of the Plan, The Bankruptcy Court shall retain the exclusive jurisdiction over the Reorganization Case for the following purposes:

**a)**    to determine any and all objections to the allowance of Claims and

28

Equity Security Interests;

**b)** to determine any and all pending applications for the rejection or assumption of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear and determine, and if necessary to liquidate, any and all Claims arising therefrom;

**c)** to determine any and all applications, adversary proceedings and contested or litigated matters that may be pending on the Effective Date, or instituted by the Reorganized Debtor after the Effective Date, including, without limitation, any Claims arising under the Bankruptcy Code to avoid any preferences, fraudulent conveyances or other voidable transfers;

**d)** to consider any modifications of the Plan, any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

**e)** to determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or the execution and delivery of any Plan exhibit;

**f)** to issue such orders in aid of execution of the Plan to the extent authorized by Section 1142 of the Bankruptcy Code;

**g)** to determine such other matters which may be set forth in the Confirmation Order or which may arise in connection with the Plan or the Confirmation Order;

**h)** to determine any and all pre-confirmation applications for allowances of compensation, entitled to priority under §507(a)(l) of the Code; and reimbursement of expenses and any other pre-confirmation fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan; and

**i)** to determine if a default by the Reorganized Debtor has occurred under the Plan as Ordered by the Court and if default has occurred, to enter such Orders as are necessary and appropriate to ensure compliance with the Plan as confirmed and/or subsequently modified.

**C.** **Discharge of Debtor**

29

1.      Except as otherwise provided herein, upon the Effective Date, all Claims against the Debtor shall be discharged, subject to Prospect's and any other parties' rights under section 523 and 1141(d)(3).

2.      All entities shall be precluded from asserting against the Debtor or its assets or properties, any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.

**D.      Title to Assets: Discharge of Liabilities**

1.      Except as otherwise provided in the Plan, on the Effective Date, title to all assets and properties dealt with by the Plan shall remain property of the estate, and shall be sold, free and clear of all liens, claims and encumbrances; and the Confirmation Order shall be a judicial determination of the liabilities of the Debtor.

**E.      Forfeiture**

1.      The Disbursing Agent shall make distributions to Creditors at the addresses set forth on the Proofs of Claim filed by such Creditors or at their last-known addresses if no Proof of Claim is filed.

2.      If any Creditor's distributions are returned as undeliverable, no further distributions to such Creditor shall be made unless and until notification is received of such Creditor's then current address, at which time, all missed distributions shall be made to such Creditor, without interest.

3.      The Reorganized Debtor or Disbursing Agent shall be under no obligation to locate or contact any Creditor.

4.      All Claims for undeliverable distributions shall be made on or before the first anniversary of the Confirmation Date. Until such time, undeliverable distributions shall be retained.

5.      After such date, all unclaimed payments shall be disbursed to any remaining Allowed Claims and the Claim of any Creditor with respect to such payments shall be discharged and forever barred.

**F.      Bar Dates For Filing Proofs of Claim**

1.      The Debtor has filed as a part of his schedules a list of all creditors, setting forth the identity of each such creditor and an indication of the amount due each

30

such creditor.

**2.** Unless a claim is listed as disputed, contingent or unliquidated, each creditor's claim will be allowed in the amount and status stated on the schedules in absence of filing of a proof of claim in a different amount or status on or before the claims bar date.

**3.** Claims listed as disputed, contingent, or unliquidated will not be allowed unless a proof of claim with all supporting documents is filed on or before the claims bar date.

**4.** Any proof of claim which is not timely filed shall be of no force and effect. No distribution will be made to any creditor that has not timely complied with this provision.

**XIII. EFFECT OF CONFIRMATION, CONFIRMATION PROCEDURES AND STANDARDS**

    **A.** <u>**Summary of Confirmation Procedures/Standards**</u>

    **1.** In order for the Plan to be confirmed, various statutory conditions must be satisfied, including:

        **a)** a finding by the Court that the Plan is feasible,

        **b)** the acceptance of the Plan by at least one impaired class entitled to vote on the Plan not counting insiders, and

        **c)** provision for payment or distribution to each claimant under the Plan of money and/or other property equal in value to at least what the claimant would have received in liquidation or, with respect to each Class, either acceptance by the Class or a finding by the Court that the Plan is "fair and equitable" and does not "discriminate unfairly" against the Class.

    **B.** <u>**Who May Vote**</u>

    **1.** Distributed along with the Disclosure Statement is a ballot on which Creditors and interest holders will vote to accept or reject the Plan.

    **2.** Only classes that are impaired under the Plan are entitled to vote on acceptance or rejection of the Plan.

    **3.** Generally, section 1124 of the Bankruptcy Code provides that a class of claims or interests is considered impaired unless a plan does not alter the legal,

31

equitable, and contractual rights of the holder of the claim or interest.

**4.** In addition, these classes are impaired unless all outstanding defaults, other than defaults relating to the insolvency or financial condition of the Debtor or the commencement of the Chapter 11 case, have been cured and the holders of the claims or interests in these classes have been compensated for any damages incurred as a result of any reasonable reliance or any contractual provisions or applicable law to demand accelerated payment.

**5.** Classes not impaired under the Plan, pursuant to section 1126(f) of the Bankruptcy Code, are deemed to have accepted the Plan without voting.

**6.** All impaired classes under the Plan are entitled to vote to accept or reject the Plan.

**7.** All classes of creditors are impaired under the Plan (Classes 1-10).   As a result of the Debtor's proposed Plan, there are ten (10) impaired classes.

**C.**   <u>**Feasibility of the Plan**</u>

**1.** In order for the Plan to be confirmed, the Court must determine that a further reorganization or subsequent liquidation of the Debtor is not likely to result following confirmation of the Plan.

**2.** The Plan Proponent believes that the Plan is feasible.

**3.** All payments under the Plan are to be made from continued operation of the business and the sale of the assets of the estate.

**4.** The risks for all creditors under the Debtor's proposed Plan include (but are not limited to) the risk that:

    **a)** The buyer does not follow through with the purchase of the assets;

    **b)** The buyer is unable to obtain necessary financing;

    **c)** No alternative buyers are located.

**D.**   <u>**Best Interests Test**</u>

**1.** With respect to each impaired class contemplated by Section 1129(a)(7)(A), each member must either: (a) Accept the Plan or (b) Receive or retain under the Plan, on account of its Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount the holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy

32

Code.

**2.** To determine what the holders in each impaired class of Claims and Interests would receive if the Debtor were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in a context of Chapter 7 liquidation case. The cash amount that would be available would consist of the proceeds resulting from the disposition of the Hotel and the related personal property, reduced by the costs and expenses of the liquidation and by such additional administration and priority expenses that may result from the termination of the Debtor's business and use of Chapter 7 for the purposes of liquidation.

**3.** The costs of liquidation under Chapter 7 would include the fees payable to the trustee appointed in the Chapter 7 case, as well as those that might be payable to additional attorneys and other professionals that the trustee might engage. Costs of liquidation would also include any unpaid expenses incurred by the Debtor during the Chapter 11 case, such as compensation for attorneys, financial advisors, and accountants and costs and expenses of any committee, that are allowed in the Chapter 7 case. In addition, Claims may arise by reason of the breach of or rejection of obligations incurred and executory contracts entered into by the Debtor during the pendency of the Chapter 11 case.

**4.** To determine if the Plan is in the best interest of each impaired class, the present value of the distributions from the proceeds of the liquidation of the Proponent's assets and properties (after subtracting the amounts attributable to the claims described above) are then compared with the present value offered to each of the classes of Allowed Claims and Allowed Interests under the Plan.

**5.** In applying the "best interests" test, it is necessary to consider that Claims and Interests in a Chapter 7 case might not be classified in the same manner as provided in the Plan. In the absence of a contrary determination by the Bankruptcy Court, all allowed unsecured claims which have the same rights upon liquidation would be treated as one class for the purposes of determining the potential distribution of the liquidation proceeds resulting from a Chapter 7 case of the Proponent. The distribution of the liquidation proceeds would be calculated pro rata according to the amount of the allowed unsecured claim held by each Creditor

33

in the class.

**6.**      The Plan Proponent believes that the most likely outcome of liquidation proceedings under Chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior class of Creditors would receive any distribution until all senior classes of Creditors were paid in full with interest, and no Interest Holder would receive any distribution until all Creditors were paid in full with interest. Consequently, the Plan Proponent believes that in any Chapter 7 case, holders of Claims in all of the Classes would receive less than under the Plan.

**7.**      In this case a Chapter 7 liquidation would likely result in significant loss of estate value due to the administrative expenses and delay caused by a Chapter 7 liquidation. Since a Chapter 7 Trustee would be unfamiliar with the facts pertaining to this case, the Trustee would be forced to spend significant time in processing this case and liquidating all assets before any distribution can be made to creditors. In addition, a Chapter 7 Trustee would bring an additional level of administrative expenses thereby further reducing the funds available for distribution to creditors. Confirmation of this Chapter 11 plan will maximize distribution to creditors and shorten the time for distribution.

**8.**      Specifically, the Debtor's books and records reflect, as of the end of the petition date, cash of almost $29,000.00, receivables of approximately $8,000.00, equipment of $240,000.00, and other assets of $304,000.00.   The Debtor believes that a conversion to chapter 7, with a liquidation of its assets would yield less than what is provided in the proposed plan.

~~8.~~9.      Prospect contests the Debtor's liquidating analysis and believes more value could be obtained by appointing an independent third party to operate Kickapoo, reduce operating costs and evaluate strategic alternatives.

**XIV.   SOURCE OF INFORMATION FOR THIS DISCLOSURE STATEMENT**

    **A.**   **Source of Information/Disclosures**

**1.**      The information contained herein has not been subject to a certified audit. Most of the information, descriptions, values and facts contained herein are derived from disclosure made by the Debtor during this bankruptcy proceeding.

34

**2.**     Accordingly, the Debtor does not warrant or represent that the information contained herein is correct, although great effort has been made to be accurate.

**3.**     This Disclosure Statement does not contain the Plan in its entirety, the Plan itself is controlling in the event of any inconsistencies. Each creditor is urged to review the Plan prior to voting.

**4.**     The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein and the delivery of this Disclosure Statement shall not under any circumstances create an implication that there has not been any change in the facts as set forth herein since the date hereof. All the terms herein have the same meanings as in the Plan unless the context requires otherwise.

**XV.   PROFESSIONAL FEES**

    **A.**   <u>**Professional Fees**</u>

        **1.**     It is estimated that, as of the filing of this Disclosure statement and Plan, the amount of accrued professional fees is $75,000.00 - $150,000.00.

        **2.**     No requests have been made to the Court by any professional requesting allowance of fees or costs.

**XVI.  PENDING LITIGATION**

    **A.**   <u>**General and Chapter 5 Causes of Action, Including But Not Limited to, Fraudulent and Preferential Transfers**</u>

        **1.**     Any avoidance power actions will be retained by the Reorganized Debtor under the Plan. The Reorganized Debtor will be given the exclusive right to enforce any and all causes of action owned by the Debtor, including any causes of action which may exist under the Bankruptcy Code or state law.

        **2.**     Any recoveries made from Avoidance Actions will be turned over to the Disbursing Agent for distribution to creditors  The Debtor does not believe that there are preference or fraudulent conveyance causes of action, however to the extent there are claims that upon further investigation exists against creditors, prepetition insiders or others, including but not limited to payments and transfers disclosed in the Debtor's Statement Of Financial Affairs, those claims are specifically retained and may be pursued by the Reorganized Debtor.

**3.**    Without limiting the general retention of claims above, to the extent specific claims exists, the Debtor will provide a schedule to be attached to the final proposed Plan prior to confirmation. the Debtor believes the following claims exist, and it retains the right to pursue each and every claim identified, as well as any related claim/cause of action, and claims/causes of action identified in the future which may relate to the entities identified below

**XVII.  ALTERNATIVES TO THE PLAN**

A.    **Conversion:**

**1.**    The Debtor expects that this Plan will enable the Liquidating Debtor to realize the most benefits for all of its creditors

**2.**    Although the Debtor is of the opinion that a straight liquidation of the assets would not be in the best interest of the creditors generally, the following is likely to occur:

**a)**    The newly appointed Chapter 7 trustee would have to become familiar with the Debtor's operations in order to evaluate all the Debtor's assets and liabilities, including the numerous claims which are the subject of pre-petition litigation and all transactions which will serve as a basis for future litigation;

**b)**    In addition to the duplication of efforts that would transpire as a result of the Chapter 7 trustee having to review documents and interview persons in order to become sufficiently acquainted with Debtor's business, the Chapter 7 trustee would likely retain professionals to aid in administering the estate;

**c)**    An additional tier of administrative expenses entitled to priority over general unsecured claims would be incurred. Such administrative expenses would include Chapter 7 trustee's commissions and fees for the professionals likely to be retained; and

**d)**    There would likely be no distribution at all to the creditors until the case was ready to be closed. The Debtor will allow the creditors and parties-in-interest to draw their own conclusions with respect to the delay associated with such detriment.

**e)**      It is certain that the above factors would result in an additional dilution to the projected dividend. The Debtor believes that such a speculative projection should be made by the creditors themselves.

**f)**      Dismissal of the proceeding would, in the judgment of Debtor, lead to an unsatisfactory result. Dismissal would result in numerous lawsuits to collect debts which would cause the Debtor to incur more expenses in the form of attorneys fees, etc., including the potential for the foreclosure of the Debtor's property.

**3.**      The Debtor has attempted to set forth possible alternatives to the proposed Plan. Accordingly, one should recognize that a vote against the Plan and the ultimate rejection of the Plan would not alter the present status of the Debtor.

**a)**      The vote on the Plan does not include a vote on alternatives to the Plan. There is no assurance what turn the proceedings will take if the Plan is rejected. If you believe one of the alternatives referred to above is preferable to the Plan and you wish to urge it upon the Court, you should consult your counsel.

**XVIII.   FEDERAL INCOME TAX CONSEQUENCE**

**A.      Consequences:**

**1.**      The Debtor believes that the following discussion generally sets forth the Federal income tax consequences to Creditors upon confirmation and consummation of the Plan.   No ruling has been sought or obtained by the Debtor from the Internal Revenue Service ("IRS") with respect to any of these matters.

**2.**      The following discussion of Federal income tax consequences is not binding on the IRS and is general in nature. No statement can be made herein with respect to the particular Federal income tax consequences to any Creditor.

**3.**      Creditors may be taxed on distributions they receive from the Estate. The amount of the income or gain, and its character as ordinary income or capital gain or loss, as the case may be, will depend upon the nature of the Claim of each particular Creditor.

**4.**      The method of accounting utilized by a Creditor for Federal income tax purposes may also affect the tax consequences of a distribution. In general, the

37

amount of gain (or loss) recognized by any such Creditor distributes will be the difference between (i) the Creditor's basis for Federal income tax purposes, if any, in the Claim and (ii) the amount of the distribution received. Whether the distribution will generate ordinary income or capital gain will depend upon whether the distribution is in payment of a Claim or an item which would otherwise generate ordinary income on the one hand or in payment of a Claim which would constitute a return of capital.

AS A RESULT OF THE COMPLEXITY OF THE APPLICABLE PROVISIONS OF THE INTERNAL REVENUE CODE, EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR IN ORDER TO ASCERTAIN THE ACTUAL TAX CONSEQUENCES TO IT, UNDER FEDERAL AND APPLICABLE STATE AND LOCAL LAWS, OF CONFIRMATION AND CONSUMMATION OF THE PLAN.

XIX.  **CONCLUSION**

A.  <u>**Summary**</u>

**1.**    The Debtor believes that approval of his Plan will provide an opportunity for creditors to receive more through the proposed Plan on account of their claims than would be received in a straight liquidation by a trustee in a Chapter 7 case or from a distressed sale of all the assets.

**2.**    If the Plan is not approved, the Debtor will continue to seek other reorganization alternatives, but liquidation might ensue, with the consequences as discussed above in relation to the liquidation alternative.

**3.**    This Disclosure Statement is subject to the approval by the Bankruptcy Court.

THE APPROVAL BY THE UNITED STATES BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE DEBTOR'S PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Respectfully submitted this 25th day of MarchJanuary, 2018.

_/s/ Michael Enn「on_____

38

By:   Michael  Emmon - Debtor


 _/s/ Miriam Goott_
Walker & Patterson, P.C.
Miriam Goott Texas Bar #24048846
P.O. Box 61301
Houston, Texas 77208-1301
Telephone (713) 956-5577
Facsimile (713) 956-5570
mgoott@walkerandpatterson.com

39